UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY G. SHINE,

          Plaintiff,

v.                                        Case No. 12-14099

                                        HON. AVERN COHN

UNITED STATES OF AMERICA,

          Defendant.

_____/

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 49)

### I. Introduction

This is a tort case. Plaintiff Anthony G. Shine (Shine) claims that on September 17, 2010 he was sexually assaulted by x-ray technician Eric Aggrey (Aggrey) at the John D. Dingell VA Medical Center in Detroit during a routine x-ray examination. Aggrey is being defended by the United States.

Before the Court is the government's motion for summary judgment. For the reasons which follow, the motion will be granted.

### II. Procedural Background

#### A.

In 2011, Shine, proceeding pro se, filed a complaint naming "Joe Defendant LNU," Eric Aggrey," and the Medical Center as defendants. Shine v. Joe Defendant, Eric Aggray, and/or John Dingell VA Medical Center, case no. 11-13549. The complaint presented a claim under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (FTCA).

The Court dismissed the complaint without prejudice because Shine had not exhausted his administrative remedies under the FTCA.  See Doc. 5 in case no. 11-13549.

Shine then filed two separate administrative claims with the Veterans Administration (VA) on November 11, 2011.  One involved Aggrey and the claimed assault.  The other involved Patient Advocate Paul Miller (Miller) and his claimed mishandling of Shine's complaint about Aggrey.  The VA denied Shine's claim against Miller on December 9, 2011, finding that Shine's allegations were not actionable under the "discretionary function" exception to the FTCA.  The VA denied Shine's claim against Aggrey on April 3, 2012 essentially for lack of merit.

In 2012, Shine filed a second pro se complaint.  The complaint named "Joe Defender," "VAMC X-Ray Technician named Mr. Eric Aggrey" VAMC Patient Advocate Paul Miller," and "the Detroit John D. Dingell VA Medical enter.:"  (Doc. 1).  Shine applied to proceed in forma pauperis, for appointment of counsel, and for service by the United States Marshal.  (Doc. 2-3).  The case was reassigned to the undersigned as a companion to Shine's 2011 case.  (Doc. 4)  The Court subsequently denied Shine's application for counsel and granted his request to proceed in forma pauperis and for service by the U.S. Marshal. (Doc. 5-6).

In December 2012, Shine filed a Request for Clerk's Entry of Default as to Aggrey, the Medical Center, and Miller.  (Doc. 8).  The Clerk entered a Default against them on January 2, 2013.  (Doc. 9).

Shortly after, defendants, represented by the United States Attorneys Office, filed a motion to set aside the default due to improper service.  (Doc. 12).  The government followed up with a Notice of Substitution, stating that the government was the proper

defendant as all the individuals were acting within the scope of their employment as employees of the United States.  (Doc. 13).  The Court then entered an order substituting the United States as defendant (Doc. 17) and an order granting the government's motion to set to aside the default.  (Doc. 16).  Thereafter, counsel entered an appearance on behalf of Shine.  (Doc. 18).

**B.**

The government filed a motion to dismiss the complaint.  (Doc. 26).  In lieu of filing an answer, Shine filed an amended complaint.  (Doc. 27).  The amended complaint named as defendants "the United States of America," "the John D. Dingell VA Medical Center," 'General Eric K. Shinseki, Secretary of Veterans Affairs," and "Pamela J. Reeves, Director of th John D. Dingell VA Medical Center."  The amended complaint made the following claims:

| | |
|---|---|
| Count 1 | violation of 28 U.S.C. § 1983 |
| Count 2A[1] | assault and battery |
| Count 2B | invasion of privacy |
| Count 3 | intentional infliction of emotional distress |
| Count 4 | negligence |
| Count 5 | breach of fiduciary duty |

Because the amended complaint contained new factual and legal allegations, the Court allowed the government an extension of time to respond to the amended complaint. (Doc. 30).  The filing of the amended complaint mooted the government's motion to

---

[1]The amended complaint contained two counts labeled "Count 2."  The Court followed the government's identification of these counts as "Count 2A" and "Count 2B."

3

dismiss the original complaint.

## C.

The government then filed a motion to dismiss the amended complaint.  (Doc. 31).  Shine filed a motion to vacate the order substituting the United States as a defendant.  (Doc. 34).

The Court denied Shine's motion and granted in part and denied in part the government's motion.  The Court dismissed all of Shine's claims except the assault and battery and invasion of privacy claims against Aggrey under Counts 2A and 2B.  (Doc. 42).

Following discovery, the government filed the instant motion for summary judgment.

## III.  Factual Background

## A.

Along with its motion for summary judgment, the government filed a detailed statement of material facts.  (Doc. 50).  Shine filed a response (Doc. 55) and an opposing statement of material facts (Doc. 54).  Subsequently, the parties filed a joint statement of material facts (Doc. 58).  The joint statement states that Shine has admitted all of the government's statement of facts and offers no additional material facts.  As such, what follows is a largely verbatim recitation of the majority of the government's statement of material facts.  Certain factual statements that are not deemed material for purposes of resolving the motion are not included.[2]  The record,

---

[2]For example, the statement of material facts contains information regarding Shine's prior unrelated civil lawsuits.

4

from which the statement of material facts has been created, contains, among other things, excerpts from Shine and Aggrey's deposition and various medical records.

**B.**

1.        Shine served in the United States Navy for approximately fifteen months, starting in September 1972.  (Ex. 1: VMAC Records, p. 380)  Shine has stated that he was administratively discharged due to the death of his brother.  Id.  He has also stated that he "has no idea" why he was discharged but his "commanding officer called [him] into the office one day and asked if [he] wanted to get out of the service, and [he] replied, 'Yes, sir,' and he let [him] out." (Ex. 2: Shine Dep. Trans., p. 52).

2.        VA Records show that administrative separation was actually recommended because of Shine's discipline problems stemming from paranoia. (Ex. 3: Clinical Record Consultation Sheet, November 16, 1973; December 5, 1973, Memorandum of J.C. Potts, Regional Dispensary Navel Regional Medical Center).  Upon examination by a psychologist, requested by both Shine and his Command, it was determined that Shine was having "problems adjusting to military life manifested by frequent disciplinary problems feeling that people are against him and harassing him."  The doctor's impression was "Paranoid Personality 301.0," and it was recommended that the "Command consider Ad[ministrative] Sep[aration] on above Dx [diagnosis]." (Id.).

3.        Shine has been seen at the John D. Dingell VA Medical Center in Detroit, Michigan (VAMC) for many years.  He has been seen for renal cyst, knee replacements, hemorrhoids, eye disease, hearing loss, vertigo, joint pain in hand

and shoulder, high cholesterol, high blood pressure, kidney stones, insomnia,
and chronic back, hip, and neck pain.  (Ex. 1: VAMC Records, pp. 468-69).  He
has also been seen for depression, at which time he reported discouragement
about the future after divorce from his wife of 22 years and the loss of his home.
(Ex. 1: VAMC Records, pp. 880-81).

4.          On the morning of September 17, 2010, at approximately 7:30 a.m., Shine
went to the VAMC for x-rays of his right hip and both knees in preparation for an
8:30 a.m. appointment with orthopedic staff surgeon Henri M. Pierre-Jacques,
M.D.  (Ex. 1: VAMC Records, pg. 739; Ex. 2: Shine Dep. Trans., pp. 54, 65).  He
had been experiencing right hip, right knee, and left knee pain and weakness,
and just the day before had been in the emergency department for pain,
numbness, tingling, and weakness to the right side of his body.  (Ex. VAMC
Records, pp. 754-757).  The X-rays were taken by Aggrey.

5.          Aggrey is a Radiologic Technologist at the Detroit VAMC performing both
X-rays and CT scans.  He has worked for the VAMC for 10 years.  (Ex. 4: Aggrey
Dep Trans., p. 9).  He has received either a cash or time-off award or promotion
almost every year since March 2004 when he began at his employment with the
VAMC.  (Ex. 5: Aggrey Declaration, ¶¶ 3-4).  Aggrey has never had any
complaint levelled against him during his twenty-five years of service.  (Ex. 4:
Aggrey Dep Trans., pp. 10, 44-45; Ex. 5: Aggrey Declaration, ¶¶ 3, 6).

6.          Shine says that Aggrey sexually assaulted him during the x-ray procedure.
(Doc. 27, Amended Compl. at ¶ 31).

7.          Shortly after the x-rays, Shine approached Miller to tell him that

"[s]omething strange just happened" during an x-ray.  (Ex. 7: Report of Contact by Miller).  Shine told Miller that the x-ray technician's hand brushed across Shine's "crotch and private parts" while reaching for his hips to position him, and that the technician had grabbed his buttocks to position him.  (Id.) Shine stated that he asked the technician to "grab [him] a little higher," that the technician "said okay and grabbed [his] hips," that then "[i]t felt much more professional [and] appropriate," and he "felt more comfortable." (Id.) Shine did not say anything about anal penetration or Aggrey taking photographs of his genitals. (Id.)

8.          Miller offered to accompany Shine to the VA Police Operations Unit to make a report, but Shine declined, telling Miller that he was "not absolutely sure" the technician had done anything wrong.  (Id.)  He just knew "how it made [him] feel and . . . something was not right." (Id.)

9.          Shine proceeded to his scheduled appointment at 8:30 a.m. with orthopedic staff surgeon Henri M. Pierre-Jacques, M.D. (Ex. 2: Shine Dep. Trans., p. 132).  Shine testified at his deposition that he was "thinking that [he would] be able to talk to someone in authority up there and continue to make [his] complaint." (Id.)  However, he did not mention anything about the alleged assault to the receptionist, the nurse, or the doctor. (Id. pp. 133-135)  Shine said that he did not mention it to the receptionist "because they took me right in" (id. at 134); that he did not mention it to the nurse because "it was one, two, three, I was up and in the consult with the knee surgeon" (id. at 135); and that he did not mention it to the doctor because "when I got there, the knee surgeon was training, I think

7

it was about five trainees, I thought about it...It wasn't nothing an intern needs to hear." (Id. at 133).

10.     Around 5:00 p.m. that evening, Shine called Miller after reportedly having difficulty dismissing the incident from his thoughts. (Ex. 7: Report of Contact by Miller). Miller, in turn, contacted the Psych-On-Call who was Dr. Naveed Shaikh, and requested that Dr. Shaikh call Shine. (Id.)  During the call, Shine told Dr. Shaikh that he did not "want [everyone] to know about this incidence [sic]." Dr. Shaikh suggested that help was available from the emergency department and the psychiatric department 24/7. (Ex. 1 VAMC Records, p. 738).

11.     Later, around 7:19 p.m., Shine went to the Detroit Police Department to report the alleged incident.  He reported that Aggrey's "knuckle brushed against his penis and his left hand was on his left buttock."  (Ex. 8: DPD Report).  Shine then "moved [Aggrey's] hand to his lower back and told him to watch it." (Id.) Aggrey then "pushed [Shine's] left leg with his palm and [Shine's] penis was along side his left thigh." (Id.) The report says nothing about anal penetration or Aggrey taking photographs. (Id.)

12.     At 3:45 a.m. on September 20, 2010, Shine created a written description of the alleged incident. ( Ex. 9: Shine's Report).  He states for the first time that he heard "the sound of a camera" taking pictures three separate times, first 4 or 5 pictures, then 3 or 4, then 10 or 12." (Id.)  He also states for the first time that two assaults occurred.  The first time, Aggrey "reached over left thigh, bushing (sic) the head of my penis with his right hand," then went back to the control room. The second time, Shine writes, Aggrey "grad (sic) my left upper thigh and penis

8

with his right hand and his left hand and fingers was up in the crack of buttock. I

grad (sic) his left hand and fingers out of my buttock with my right hand, ... he

quickly let me go, It was about 7:55 when walk out of the x-ray room." (Ex. 9:

Shine's Report).  This is the first time Shine stated that Aggrey's fingers had

gone "up in the crack of the buttock" or anywhere near his anus. (Id.)

13.        Around 9:30 a.m. the same day, Shine was seen by Physician Assistant

Mary Mitchell ("Mitchell") in the mental health clinic at VAMC. (Ex. 1: VAMC

Records, pp. 735, 737).  Shine indicated to Mitchell that his "buttock was

scratched by the clinician in question [sic] nails." (Id. at 735). Mitchell advised

that if it were so, he would need to go to the emergency department or urgent

care for verification of scratches before going home that day. (Id.)

14.        Immediately after Mitchell saw Shine, she asked psychologist Bernard

Gaulier, Ph.D., to see Shine on a walk-in basis. (Id. at 737.)  To Dr. Gaulier,

Shine reported that Aggrey had brushed his penis and touched his buttocks. (Id.).

Shine did not say anything about Aggrey putting his fingers between the cheeks

of his buttocks or in his anus, or about Aggrey taking photographs. Ongoing

therapy was recommended, but Shine stated that he was not interested. (Id.)  Dr.

Gaulier diagnosed Shine with Adjustment Disorder with Depression. (Id. at

737-738).

15.        After Shine saw Dr. Gaulier, he was accompanied by Mitchell to the VA

Police Department to file a report. (Id. at 735).  In an interview with Officer David

Hand, Shine said that Aggrey groped him and inappropriately touched his

genitals and buttocks.  (Ex. 10: VAMC Police Report).  Shine did not report

anything about Aggrey putting his fingers between his buttocks or in his anus or that photographs were taken. (Id.)  He did provide the written description of the event he had prepared at 3:45 a.m. (Id.).

16.        There is no record that Shine, as instructed by Mitchell, went to the emergency department for physical examination before leaving the VAMC that day.

17.        The next day, on September 21, 2010, Shine spoke with VAMC Officer Marlon Friendly by phone. Shine stated that "after further thought about the situation he suspects that he might have abrasions in the area of the rectum." (Ex. 10: VAMC Police Report, p. DEF-1389). Shine went to Urgent Care and Nurse Practitioner Michael Wesner performed an examination of the rectum and no abrasions were found. (Ex. 1: VAMC Records, pp. 729-733).

18.        On September 23, 2010, after receiving the results from the rectum examination and due to the lack of evidence and multiple changes in Shine's version of the events, Friendly closed the VAMC case.  (Ex. 10: VAMC Police Report, p. DEF-1390)

19.        On October 1, 2010, Shine went to the VAMC for a Neurology Consult with Dr. Harry Greenberg. Shine complained that he gradually developed right sided numbness and tingling over his entire body over the past two and a half weeks and that the incident has caused his symptoms to get worse. He also complained that the incident caused him to develop a stutter.  (Ex. 1: VAMC Records, p. 710).  Based on the exam, it appeared to Dr. Greenberg that his pain and skeletal complaints were rheumatologic. (Id. at 714).

10

20.          On October 8, 2010, Shine decided to follow up with staff psychologist Gaulier.  During that session, Shine said that he had been informed by the VA police that no charges would be pressed, and that he would like to pursue other legal avenues.  (Ex. 1: VAMC Records, pp. 707-708).

21.          On December 7, 2010, Shine had an appointment with psychiatrist Barbara Day.  He reported for the first time unequivocally that Aggrey had "penetrated his anus with his finger."  He also said that he lost weight because of the incident.  He was weighed, and had gained 12 pounds.  (Ex. 1: VAMC Records, p. 649).   Shine reported being worried about his personal information being in the VA system and accessible to his alleged attacker.  (Id.)

22.          On December 14, 2010, Shine reported hemorrhoid problems to Nurse Practitioner Kathleen Cobb, and that he had to digitally reduce his hemorrhoidal tissue. He reported that "since the 'sexual assault' in radiology department, his anus has 'not been the same since...Patient thinks the assault may have dislodged something in his anus."  (Ex. 1: VAMC Records, p. 638).

23.          Shine was referred to New Century Home Care (NCHC) for blood pressure monitoring and speech therapy.  (Ex. 11: NCHC Records, p. 8). On April 11, 2011, NCHC conducted a Comprehensive Adult Assessment on Shine. Under the section Speech and Oral (Verbal) Expression of Language, the best rating was a "0", meaning no observable impairment and the lowest rating was a "5", meaning patient is nonresponsive or unable to speak. Shine was rated a "1": "Minimal difficulty in expressing ideas and needs (may take extra time; makes occasional errors in word choices, grammar or speech intelligibility; needs

11

minimal prompting or assistance)." (Id. at p. 26). On April 28, 2011, in a therapy

progress note, it is noted that "Pt still continues to stutter inconsistently." (Id. p.

110). In NCHC's final evaluation on June 6, 2011, Shine was given the rating of a

"0" by NCHC, meaning no observable impairment.  (Id. at p. 39).

24.         On July 21, 2011, Shine went to see a Speech-Language Pathologist at

the DMC's Rehabilitation Institute of Michigan (RIM). During the first visit with this

speech therapist, Mohamed L. Osman noted that "Mr. Shine's patterns were

deliberate, mechanical, and appeared behavioral in nature...[H]is patterns

consisted of inconsistent periods of hesitations...." He highly recommended that

Shine receive "some type of counseling and emotional support versus long-term

speech therapy."  Osman said that Shine was speaking fluently and with varied

intonation by the end of the evaluation. (Ex. 12: RIM Records, p. 37).

25.         Shine believed there was a conflict of interest in seeing providers at

VAMC for mental health treatment.  (Ex. 13: UPC Records p. 6).  On April 12,

2011, he began going to the University Psychiatric Center (UPC) and saw Dr.

Iyantta Howell.  (Id.)  Shine told her that a VA x-ray tech "touched his genitals

and attempted to digitally penetrate his anus...." (Id.).

26.         Dr. Howell believed that Shine did not have PTSD, and noted on more

than one visit that he appeared to exaggerate symptoms and to be voluntarily

stuttering. (Id. at pp. 6, 8.)  She opined during her last visit with Shine that his

"[i]nappropriate comments, vagueness and likely exaggeration of mood

symptoms could be pt's attempt to distract writer from axis 2 issues,[3] which is a major factor in this case." (Id. at p. 1).  Finally, she believed that "pt's euthymic affect and inconsistency in reporting raises suspicion for secondary gain." Malingering was strongly suspected.  (Id. at pp. 1-2, 8).

27.      On November 11, 2011, Shine filed an administrative claim with the Veterans Administration based on the alleged assault and photographs. (Ex. 14: Administrative Claim.)  He submitted an extremely detailed five-page description of events, in which he claimed that Aggrey "brush (sic) the head of [his] penis...[Aggrey's] right hand was feeling and touching [his] penis, again,...and opening [his] legs....[T]he x-ray tech is all up on [him] and had [him] penned....his hands, was moving everywhere....his, left hand and arm, was loose, grabbing and groping...[Shine] shouted at him, as loud as [he] could, 'Get your hands, off my ass!'" After taking more x-rays, Aggrey returned to Shine and "grabbed my penis, again...[H]e was all over [him]. His, left hand and fingers, had move, up in, the outside of, [his] briefs, in the opening, of [his] buttock....Then [he] had encountered, a horrific shark (sic), shooting pain, on the right side, of [his] body. [His] neck, shoulder, elbow and arm, wrist and the middle back, hip, knees, ankles and tingling in [his] fingers and toes." Shine again claimed that he heard the sound of a camera taking pictures.  (Id.) The administrative claim added that after the assault Aggrey smelled the left hand and fingers that had been "in the

---

[3]Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually life-long problems that first arise in childhood. http://www.psyweb.com/DSM_IV/jsp/Axis_II.jsp . Paranoid personality disorder is a personality disorder that falls under Axis II.

opening, of [Shine's] buttock." (Id.)

28.        On August 1, 2012, Shine was examined by Steven Putnam, Ph.D., for

purposes of assessing Shine's eligibility for "1151 benefits" for a

service-connected injury—i.e. the alleged assault and battery. Putnam concluded

that Shine's allegations "lack[ed] credibility" and that "his perception of the

technician as a perpetrator and predator relates to Mr. Shine's fundamental

paranoid tendencies." Putnam found it "very difficult to determine" whether

Shine's allegations were "a misperception on the part of Mr. Shine or a more

malignant attempt motivated by secondary gain" (Ex. 17: Putnam Review of

Claim File, p. 19.)

29.        On September 14, 2012, Shine filed suit pro se. (Doc. 1 ).  His complaint

was 38-pages long, excluding exhibits.  (Id.)

30.        On June 14, 2013, Shine's newly-retained counsel filed an Amended

Complaint alleging that Aggrey sexually assaulted Shine during the x-ray

procedure, causing pain and bleeding in his anus, pain and weakness on the

right side of his body, the development of a stutter, and depression and

Post-Traumatic Stress Disorder; and that Aggrey took photographs of his genitals

(Doc. 27 at ¶¶ 31-32, 36-37).  Shine further alleged that patient advocate Paul

Miller mishandled his report of the alleged assault, including closing a door in his

face, "scold[ing], chastis[ing], criticiz[ing] and humiliat[ing]" him, verbally abusing

him, and refusing to assist him in filing a complaint. (Id. at ¶¶ 14-28.)

31.        On March 17, 2013, Shine was deposed.  He testified that Aggrey

assaulted him four separate times during the x-ray exam.  (Ex. 2: Shine Dep.

14

Trans., p. 203).  Aggrey allegedly brushed the head of his penis, put his hand around Shine's thigh and penis, pushed Shine around, moved Shine's penis, became aggressive and frustrated, pinned Shine to the panel, forced his hand and fingers through Shine's briefs and up into his anus (causing Shine to bleed from his rectum) and smelled the finger or fingers that had been in Shine's anus. Shine added said that Aggrey had pulled out Shine's hemorrhoids.  (Ex. 2: Shine Dep. Trans., pp. 92, 101, 104, 106-107, 194, 196, 201).

32.         Shine further testified that when he met with Miller after the alleged assault, he told Miller that Aggrey had penetrated his anus and that he was still wearing the "bloody underwear" from the assault, but that Miller ignored it.  (Ex. 2: Shine Dep. Trans., pp. 131, 187).

33.         With respect to the photographs, Shine testified that he heard the x-ray machine taking x-rays and a camera taking pictures, and that the sounds were different: "The x-ray machine has a long roar prior to taking, when he's taking a picture, the X-ray. The other sound sounds like a camera click, a camera clicking."  (Id. at p. 91)  He also testified that during his appointment with orthopedic surgeon Dr. Pierre-Jacques immediately after the alleged assault, the doctor pulled up his x-ray films on computer and instead actual pictures of his penis appeared. Shine claims that the doctor quickly shut off the monitor and "didn't say a word...It wasn't a x-ray image; it was a picture, a clear picture, of my private parts for all to see." (Id. at pp. 67, 154-156).  Shine also testified that when he requested copies of his x-rays from that day, he received only images of his genitals.  (Id. at pp. 157-158).

15

34.         On March 18, 2014, Shine had a psychiatric evaluation by Dr. Elissa P.

Benedek, in which he reported that he had grabbed the technician's hand and

scratched it and, again, that the technician pulled his hemorrhoids out. "He went

under my underwear and pulled my hemorrhoids out."  (Ex. 15: Benedek Report,

pp. 3-4).

36.         Dr. Benedek concluded that Shine "does suffer from a diagnosable mental

disorder, specifically a Paranoid Personality Disorder."  A diagnosable mental

disorder is a clinically significant behavioral or psychological syndrome or pattern

that appears in a person that is associated with present distress (a painful

symptom) or disability (impairment in one or more important areas of functioning)

with a significantly increased risk of suffering death, pain, disability, or important

loss of freedom. A lesser degree of impairment is represented by psychological

symptoms, which may involve subjective distress, some compromise in

psychiatric resources and interpersonal relationships, or mild functional

impairment, but the difficulties do not rise to the level of a diagnosable mental

disorder.  (Ex. 15: Benedek Report, p.13).

37.         Paranoid Personality Disorder is a pervasive distrust and suspiciousness

of others such that their motives are interpreted as malevolent as indicated by,

inter alia, suspecting without sufficient basis that others are exploiting, harming or

deceiving him or her; reading hidden demeaning or threatening meanings into

benign remarks or events; and persistently bearing grudges and being

unforgiving of insults or slights. (Id. at pp. 14-15).

37.         On March 27, 2014, Shine had a psychological evaluation with Charles

Clark, Ph.D., during which he claimed that Aggrey "stuck his right hand and finger up through [Shine's] underwear into [his] rectum." When asked how the tech had gotten through his underwear, Shine said, "He had torn it to do it," and made a hole in the fabric.  (Ex. 16: Dr. Clark Report, p. 3). Shine added the fact that Aggrey "kept slamming [him] against the wall" and that he had bruises from Aggrey's grabbing him.  (Id. at p. 5)

38.      Dr. Clark had Shine complete the Minnesota Multiphasic Personality Inventory-2 (MMPI-2-RF) and the Personality Assessment Inventory (PAI), both standard tests to help diagnose psychological conditions.  Dr. Clark concluded that there "were strong signs on both measures that he was not answering in a forthright manner."  (Id. at p. 6).

39.      On the MMPI-2-RF there were indications of depression and anxiety, but these were exceeded by strong signs of unrealistic somatic complaints and by "paranoid-like thinking"—i.e. suspiciousness, resentment, blaming others, and alienation from others. (Id.) Various validity scales showed exaggeration of psychological symptoms (Scale F-r, 106) and physical symptoms (Fs, 83); under-reporting of undesirable traits or behaviors (L-r, 71); and an unusual combination of responses associated with non-credible reports of somatic and cognitive symptoms (FBS-r, 89).  (Id. at pp. 6-7)

40.      On the PAI, a similar pictured emerged.  The validity of his reports of severe depression and anxiety was compromised by his pattern of answers, which indicated he was trying to portray himself as exceptionally free of common shortcomings.  (Id. at p. 7).

17

41.        Dr. Clark concluded that the two tests were not reliable indicators or

confirmation of the symptomatic complaints as Shine reported but instead of "an

orientation to exaggerate or misrepresent his psychological status, while

simultaneously presenting himself in an unrealistically favorable light."  (Id.)

## IV.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by

'showing' – that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S.

317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>
> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The Rule also provides the consequences of failing to properly

support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly
> address another party's assertion of fact as required by Rule 56(c), the
> court may:
>
> (1) give an opportunity to properly support or address the fact;

18

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials –
including the facts considered undisputed – show that the movant is
entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may

consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Ultimately a district court must determine whether the record as a whole presents a

genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light

most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286

F.3d 366, 370 (6th Cir. 2002).

## V.  Analysis

### A.  Parties' Arguments

The government argues that summary judgment is proper because (1) Shine's

assault and battery claim fails as a matter of law as it is subject to the intentional tort

exception of the FTCA and (2) there is no genuine issue of material fact as to whether

an assault and battery or invasion of privacy actually occurred.

Shine argues that the government has waived the right to argue the intentional

tort exception applies and even if it has not waived the right, the intentional tort

exception does not apply.  Shine also argues the record contains a genuine issue of

material fact as to whether he was assaulted and whether he has made out a triable claim for invasion of privacy.

### B.  Intentional Tort Exception

Under the FTCA, the United States, as sovereign, is "immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." Lehman v. Nakshian, 453 U.S. 156, 160 (1981).  If Congress waives the government's sovereign immunity from suit, a Shine's rights are limited to the terms of the government's consent to be sued.  See United States v. Testan, 424 U.S. 392, 399 (1976).  Waivers must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires.  Estate of Smith ex rel. Richardson v. United States, 509 F. App'x 436, 440, 2012 WL 6621350, 3 (6th Cir. 2012), citing Library of Cong. v. Shaw, 478 U.S. 310, 318 (1986); Blakely v. United States, 276 F.3d 853, 864 (6th Cir. 2002)  One of those exceptions is for certain intentional torts.  28 U.S.C. § 2680(h).  The intentional tort exception provides that the FTCA's waiver of sovereign immunity does not extend to "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

In Levin v. United States, 133 S. Ct. 1224 (2013), the Supreme Court discussed the intentional tort exception and made clear that a plaintiff can sue the United States under the FTCA for the intentional torts enumerated under § 2680 (h) when, as in the Levin case, they are committed by certain military health care employees and also when they are committed by VA health care employees.  Levin, 133 S.Ct. 1224, 1235.  The

20

ability to sue for the actions of those individuals is derived from statutes other than the

FTCA.  In the case of the VA, the applicable statute is 38 U.S.C. § 7316, which

provides:

> the exception provided in section 2680(h) of title 28 [the FTCA's "intentional tort
> exception"] **shall not apply to any negligent or wrongful act or omission of
> any person described in subsection (a) in furnishing medical care or
> treatment** (including medical care or treatment furnished in the course of a
> clinical study or investigation) while in the exercise of such person's duties in or
> for the Administration.

38 U.S.C. §7316(f) (emphasis added).

The persons "described in subsection (a)" are "health care employee[s] of the

Administration," defined as "a physician, dentist, podiatrist, chiropractor, optometrist,

nurse, physician assistant, expanded-function dental auxiliary, pharmacist, or

paramedical (such as medical and dental technicians, nursing assistants, and

therapists), or other supporting personnel."  38 U.S.C. §7316(a)(2).

The government raised this argument in its opening brief on its motion to dismiss.

See Doc. 31 at pp. 9-11.  In response, Shine cited the Supreme Court's decision in

Levin to argue that intentional tort exception does not apply to cases involving VA

medical professionals.  See Doc. 35.  In its reply brief, the government said:

> To be clear, in light of Levin, Defendants hereby withdraw their argument . . . that
> the assault and battery exception precludes an FTCA claim involving the actions
> of Eric Aggrey, the x-ray technician accused of touching Plaintiff inappropriately
> while positing Plaintiff for his hip x-ray...

(Doc. 38 at p. 3).  The government, however, continued to argue that the intentional tort

exception applied to Shine's claims against Miller because his actions as a patient

21

advocate could not be possibly considered to involve medical care or treatment.  In a lengthy footnote, the government went on to say that a "colorable argument" could be made that Aggrey's alleged actions do not constitute "furnishing medical care or treatment" because the alleged actions took place while giving medical treatment but were not, as was at the case in <u>Levin</u>, actions which constituted a medical battery.  The government pointed out that in <u>Levin</u>, the plaintiff was operated on without consent, resulting in harmful medical consequences.  Here, the battery is alleged to have occurred at the same time as medical treatment, the treatment of which is not alleged to have been medically improper.  (Id. at p. 6 n.2).

The Court did not address this argument in denying the government's motion to dismiss.  Instead, the Court simply said that the government has agreed that Shine stated a plausible assault and battery claim against Aggrey.  The Court also did not address the intentional tort exception as to Miller because it concluded that Shine's claims against Miller were time barred.  In a footnote, the Court also said that Shine's claims against Miller may be barred by the discretionary function exception to FTCA liability.  (Doc. at p. 7).

In seeking summary judgment, the government has resurrected its argument.  The government says that withdrawing an argument on a motion to dismiss does not constitute a waiver, particularly where discovery has further fleshed out Shine's claim.  The government goes on to argue in detail that the Court should interpret Levin as limiting the ability of a plaintiff to bring an intentional tort claim against medical personnel only in cases where the tort could be construed as a medical battery, i.e.

22

performance of a medical procedure without consent.

The Court need not venture into the thicket of whether Shine's assault and battery claim, under the circumstances alleged, is subject to the intentional tort exception or whether the government has waived the right to raise this argument. This is so because, as explained below, viewing the facts in a light most favorable to Shine, no reasonable juror could conclude based on the record that Shine suffered an assault or battery or an invasion of privacy. In other words, there is simply no genuine issue of material fact as to whether Aggrey acted inappropriately with respect to Shine. For this reason, summary judgment is warranted.

### B. Shine's Claims

### 1. Assault and Battery

Under Michigan law, an assault can occur in one of two ways: either (1) an attempt to commit a battery ("attempted-battery assault"); or (2) an unlawful act that places another in reasonable apprehension of receiving an immediate battery ("apprehension-type assault") People v. Nickens, 470 Mich. 622 (2004)). A battery, in turn, is defined under Michigan law as "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person ." Nickens, 685 N.W.2d at 661 (quoting People v. Reeves, 458 Mich. 236, 580 N.W.2d 433, 435 n. 4 (1998)). Therefore, "a battery is the successful accomplishment of an attempted-battery assault." Id.

No reasonable juror could conclude from the record that Shine suffered an assault and battery by Aggrey. First, Shine's story of the assault has varied

23

dramatically.  On Friday morning, when he saw patient advocate Miller immediately following the alleged assault, Shine was not even sure anything intentional had happened; he just knew "how it made him feel."  (Statement of Facts No. 8).  By that evening, he reported an assault to the Detroit Police Department that included groping and touching, but no anal penetration.  By the end of weekend, in the middle of the night—3:45 a.m. Monday morning—he typed a narrative that included Aggrey taking photographs and placing his fingers "up in the crack of [Plaintiff's] buttock."  (Id. at 12). To a nurse practitioner at the VA on Monday morning, he mentioned scratches on his buttock, but would not go to the emergency room to have them checked out.  The first time Shine unequivocally stated that Aggrey had actually penetrated his anus was three months after the alleged incident.  And thereafter, he added additional details to the story:  hemorrhoids that actually came out of his anus, his offer to show his bloody underwear to the patient advocate, Aggrey smelling the fingers that had penetrated his anus, and Aggrey tearing a hole in his underwear with his fingers.

Second, a physical examination of Shine four days after the alleged incident did not reveal any physical evidence of an assault.  Had Aggrey actually thrust his fingers into Shine's anus, causing pain, bleeding, and the dislodging of hemorrhoids, as Shine eventually alleged, the lack of any physical evidence is unusual.

Third, there is no evidence of PTSD or a stutter caused by the alleged incident. Doctors Gaulier, Day, Howell, Putnam, Clark, and Benedek found neither.  Dr. Howell has opined that Plaintiff did not have PTSD or a stutter, and that his exaggerated descriptions of symptoms were likely due to a motivation for "secondary gain"—i.e.

24

damages in this lawsuit—or the patient's attempt to distract the psychologist from his personality disorder.

Finally, it is also important to note that the government does not solely rely on Aggrey's deposition testimony where he denies assaulting Shine.  The government also relies on the medical records as to Shine's mental disorder, the absence of any medical records showing Shine was injured, as well as the fact that Shine's version of the events changed significantly over time.  All of this, the government says, is sufficient to show that there is no genuine issue of material fact as to whether an assault occurred.

Shine, however, argues that his statements must be credited on a motion for summary judgment and says his statements create a genuine issue of material fact.  In particular, Shine points to his deposition testimony.  The problem for Shine is that his deposition testimony is not consistent with his prior statements.  Indeed, as explained in detail above, Shine's version of the events has varied wildly over time and is itself inconsistent.  There is no medical evidence to support his allegations.  To meet his summary judgment burden, Shine relies on his deposition testimony, which varies from his other statements made about the incident.  He has no other corroborating evidence.

Under the circumstances, Shine's deposition testimony is insufficient to create a genuine issue of material fact.  Summary judgment is therefore appropriate, as other courts have found faced with a similar record.  See Fuller v. Rogner, 2010 WL 779059, at * (E.D. Mich. Mar. 8, 2010) (plaintiff's deposition testimony that defendant police officer struck him in the head at the jail insufficient to create genuine issue of material fact where police department activity logs indicated that defendant was elsewhere at the

time of the alleged assault); <u>Stratford v. Merlo</u>, 2013 WL 3895439, (E.D. Mich. July 29,

2013) (summary judgment for defendant officer where plaintiff's only of an assault was

his uncorroborated testimony that officer broke plaintiff's ankle); <u>Mohamud v. Johnson</u>,

2009 WL 4110326 (W.D. Wash. Nov. 19, 2009) (summary judgment for officer where

plaintiff's only evidence of excessive force was his uncorroborated testimony that

plaintiff had been kneed in back, kicked in right hip, and struck four times in face and

ribs and plaintiff's testimony was inconsistent with his earlier statements).

### 2.  Invasion of Privacy

The tort of invasion of privacy  " 'has evolved into four distinct tort theories: (1)

the intrusion upon another's seclusion or solitude, or into another's private affairs; (2) a

public disclosure of private facts about the individual; (3) publicity that places someone

in a false light in the public eye; and (4) the appropriation of another's likeness for the

defendant's advantage.' " <u>Dalley v. Dykema Gossett</u>, 287 Mich. App 296, 306 (2010)

quoting <u>Doe v. Mills</u>, 212 Mich. App 73, 88; 536 NW2d 824 (1995).

Here, the Court assumes, as did the government, that Shine's claim is based on

the first theory.  To maintain an action for intrusion upon plaintiff's seclusion or solitude,

plaintiff must show that there was (1) an intrusion by defendant; (2) into a matter which

plaintiff has a right to keep private; (3) by the use of a method which is objectionable to

the reasonable person.  <u>Earp v. Detroit</u>, 16 Mich. App. 271 (1969).

Here, the government concedes that using a patient's consent to be x-rayed as

an opportunity to take actual photographs of a patient's genitals, presumably without

professional purpose, is an intrusion of privacy likely objectionable to a reasonable

26

person.  Putting aside that the allegation that Aggrey took pictures was part of Shine's changing version of the events, the existence of the alleged photography is speculative and conjectural.  Although Shine has made the allegation that Aggrey took photographs, there is no evidence of such photographs.  At best, Shine says that he heard "what sounded like a camera snapping photographs" during his x-rays.  The only evidence of this is his own perception of sounds he heard during the procedure.  That is not sufficient.

Shine also says that he obtained a copy of his x-rays from that day, and found "images of his genitals included in the disk he was provided by the VAMC."  (Doc. 27, Amended Compl. at ¶ 23; Statement of Facts at Nos. 33-34.)  The government agrees that Shine's hip x-rays likely contain images of his genitals, as do most hip x-rays, but says that does not render his x-rays actual photographs.  Shine testified in deposition that Dr. Pierre-Jacques attempted to pull up x-ray films during the appointment immediately after the alleged assault, in the presence of interns, and "It wasn't a x-ray image; it was a picture, a clear picture, of my private parts for all to see."  Shine has not specified why he believed these images were "pictures" and not x-rays, and he has not produced the alleged "pictures" in discovery.  Nor did he depose Dr. Pierre-Jacques or any of the interns who were allegedly in the room to support his allegation that pictures, and not x-rays, were being shown.  Again, Shine's evidence consists only of his deposition testimony.  Absent any corroboration, it is not sufficient to carry his summary judgment burden.  Simply stated, no reasonable juror could find that Aggrey invaded Shine's privacy.  Summary judgment is therefore appropriate.

## VI. Conclusion

Because there is no evidence over which there is a genuine issue of material

fact, the government's motion for summary judgment is GRANTED.  This case is

DISMISSED.

SO ORDERED.

_S/Avern Cohn_____

AVERN COHN

UNITED STATES DISTRICT JUDGE


Dated:  September 30, 2014

Detroit, MI


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, September 30, 2014, by electronic and/or ordinary mail.


S/Sakne Chami_____

Case Manager, (313) 234-5160

28